Albert Axler and Mary Axler v. Commissioner. Albert Axler v. Commissioner. Albert and Mary Axler v. Commissioner.
Axler v. Commissioner
Docket Nos. 41762, 52134, 52135.
United States Tax Court
T.C. Memo 1956-58; 1956 Tax Ct. Memo LEXIS 237; 15 T.C.M. (CCH) 262; T.C.M. (RIA) 56058; March 13, 1956
*237 Petitioner Albert Axler owned and operated a meat and grocery market and owned bonds and various rental properties during the years here involved. Held: 1. Respondent was justified in resorting to the net worth-plus-nondeductible expenditures method to show understatements of income for the years in issue. 2. Various disputed items in the net worth computation are adjusted and determined. 3. Some part the deficiency in respect to each of the years 1947, 1948 and 1949 was due to fraud with intent to evade tax. 4. Each of the returns for the years 1947 and 1949 (being two of the years in which the issue of limitations is involved) was false and fraudulent with intent to evade tax. 5. Respondent did not meet his burden of proving that any part of the alleged deficiency for the years 1943, 1946 and 1950 was due to fraud with intent to evade tax. He likewise failed to meet his burden of proving that petitioners' returns for the years 1943 and 1946 (the remaining years in which the issue of limitations is involved) were false and fraudulent with intent to evade tax. The statute of limitations bars assessment for such years. 6. Imposition of the penalty for substantial understatement *238 of estimated tax in accordance with 294(d)(2), I.R.C. of 1939, approved with respect to the years 1947, 1949 and 1950, to the extent, if any, that such penalties may be applicable after determination under Rule 50. Edwin P. Friedberg, Esq., Raleigh Building, Raleigh, N. C., for *239 the petitioners. James R. Harper, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes and penalties in respect to petitioners, as follows: Sec. 293(b)
Sec. 294(d)(2)
Year
Deficiency
Penalty
Penalty
Albert Axler
1943
$ 9,538.53
$4,769.27
$559.80
1946
19,943.13
9,971.57
975.21
1947
16,278.93
8,138.47
928.74
Albert and Mary Axler
1948
9,611.46
4,805.73
Albert and Mary Axler
1949
3,524.76
1,762.38
203.48
1950
927.02
463.51
96.51
The principal issues presented for our consideration are: (1) whether respondent properly resorted to the net worth-plus-nondeductible expenditures method of determining net income; (2) whether any part of the several deficiencies was due to fraud with intent to evade tax; (3) whether the returns for 1943, 1946, 1947 and 1949 were false and fraudulent with intent to evade tax; and (4) whether section 294(d)(2) penalties for substantial underestimate of estimated tax are to be applied in the years 1943, 1946, 1947, 1949 and 1950. Issues involving the admissibility of evidence are also raised. *240 Findings of Fact Petitioners timely filed Federal income tax returns for each of the years involved in these proceedings (in certain of the years in accordance with extensions granted) with the collector of internal revenue for the district of North Carolina. Background and General Facts Albert Axler was born in Romania. He there attended a school at which he was taught to read and write only Hebrew. When he came to the United States in 1920 he was 20 years old. He could not speak any English at that time. He is still unable to either read or write English and he has some but not serious difficulty in speaking and understanding spoken English. He can sign his name, and can read, write and understand figures. He also knows how to operate a cash register and an adding machine, and at times did so. In 1920, Axler opened a Kosher butcher shop in Brooklyn, New York. He remained in that business for three or four years. About 1924, he married Mary Axler and later moved to Wilmington, North Carolina, where he and his family presently reside. When he first came to Wilmington, Axler went into the business of peddling dry goods from house to house. In 1926, he opened a grocery and *241 meat market at 909 North Fourth Street, in Wilmington, located in the colored section of that city. Axler's original investment in the store consisted of $4,000 which he had saved from his butcher business in Brooklyn, an additional $2,500 which his wife had received in gifts from her family at the time of their marriage and $1,500 which he had borrowed on a life insurance policy. The business prospered from the beginning. The store is still operated on the same premises. Up to about 1948, the store was generally open six days a week. Thereafter it was also open half a day on Sundays. From about the middle of 1947 to the middle of 1949, Axler owned and operated a second retail meat and grocery store at 1201 N. Fourth Street. Axler's son, Leon, managed the second store during the entire period. Axler and his family have constantly lived frugally and maintained a relatively low standard of living. Axler, who took great pride in saving money, attempted to do so to whatever extent possible. The Axlers' home was next door to the store in a poor neighborhood. Axler was an extremely hard worker. Each member of the family, Axler, his wife and his seven children, has worked in the store. *242 Axler bought his first automobile in 1930 and possessed the same car in 1950. Until recent years the Axler home had no central heating system, the family cooked on coal and wood stoves, and it was not until 1945 or 1947 that Axler installed a refrigerator. Petitioner Albert Axler timely signed a consent form extending the period of limitations under section 276(b) of the Internal Revenue Code of 1939 for the taxable year 1948 until June 30, 1953. The statutory notice of deficiency with respect to 1948 was mailed on March 14, 1952. On September 11, 1952, Axler was indicted for the evasion of Federal income taxes for the years 1946 through 1950. On November 21, 1952, Axler entered a plea of nolo contendere before the United States District Court for the Eastern District of North Carolina, was found guilty as charged and was fined $2,000 on each of the counts for the several years involved. Axler entered his plea upon the advice of his then counsel who had no experience in the handling of tax cases. Said counsel gave the advice because he had been unable to prepare for Axler's defense; was not able to arrange a postponement of the trial in order to give the taxpayer time to have an *243 audit made of his books or to employ counsel experienced in the tax field, and also because he was assured that upon such a plea he could have the matter brought up in Wilmington, N.C., where the businessmen would testify for Axler. Facts Relating to Axler's Books and Records For the years 1943 to 1950, inclusive, Axler reported the income from his meat and grocery businesses on a hybrid basis, i.e., a cash basis, except that he used inventories in the computation of gross income and in his returns for 1948 and 1950 included accounts payable and prepaid expenses. Axler kept memoranda in Hebrew covering some cash purchases, and also rental payments. His business books were kept largely by his son and daughter, with postings made or checked by bookkeepers or accountants employed for that purpose. Some time prior to 1933, he employed a man named Friar to keep books for the 909 N. Fourth Street store. Friar at that time set up and maintained some books for Axler's business. In 1933, Axler engaged William J. Blackwell, a public accountant, to undertake the necessary bookkeeping and accounting. Blackwell was so employed first through 1939 and then again during part of 1944, and from *244 1947 through part of 1949. Blackwell began his work by establishing a more comprehensive set of books than had theretofore been utilized by Axler, including a journal. No general ledger was kept except for 1950 and part of 1949. During the first period of Blackwell's employment, Axler, his son Leon, or his daughter Esther, though principally Leon, took a daily reading from the cash registers in the store, counted the cash, checked the amount against the register readings, and entered the total daily receipts shown on the sales register tapes at the end of each day in a small notebook. These figures were kept by days and totalled generally by the month. Not all of the daily sales figures, however, were recorded immediately at the end of a day. Blackwell would periodically post these various entries to the general journal, or at least check the postings done by Leon or Esther. He also added the weekly and monthly totals in the small notebooks. The items of expense were likewise posted periodically by Blackwell. He obtained his figures from two sources: (1) cancelled checks and available invoices, each of which to the extent possible were checked against one another prior to posting, *245 and (2) certain small memo sheets marked with Hebrew characters and representing notations of items of expense paid by Axler in cash. The checks were all signed by Axler, but since he could neither read nor write any English the checks were actually prepared by others, including at times Blackwell. The memo sheets reflecting cash expenditures were regularly kept by Axler. As they were made out, they were placed on a spindle by the main cash register in the store. Blackwell, who could not understand the Hebrew characters, relied on Axler to interpret them for the purpose of posting the cash expenditures represented thereby. Blackwell audited Axler's books for the years 1943 through 1948, inclusive. He had previously prepared Axler's Federal income tax returns filed for the years 1944-1948. During the years 1944, 1945 and 1946, the Axler children made various book entries which were checked on an average of about once a month by Blackwell. In 1940, following Blackwell's first period of employment by Axler, Isaac Shain began keeping Axler's books, doing so through 1943. It was Shain who, in 1940, induced Axler for the first time to open a bank account. (See infra findings relating *246 to Cash on Hand.) Shain prepared Axler's 1942 and 1943 Federal income tax returns. Shain did not take care of all of the bookkeeping and was not a full-time bookkeeper. He undertook mainly the tasks of totaling and posting. He did so only on the basis of information supplied him, consisting mainly of slips on which Axler or his son had marked down the daily sales taken from the register tapes. Shain would enter these figures in a ledger as daily sales. Such posting was not done every day, however. Shain also balanced Axler's monthly bank statements and prepared checks for Axler to sign. After Blackwell terminated his employment with Axler for the second time in 1949, Axler engaged William C. Barfield, a certified public accountant, in February 1950, to audit his books. Barfield undertook to complete Axler's accounting for 1949 and prepared Axler's Federal income tax return for 1949. He also prepared a list of Axler's assets. At that time Axler's books and records did not include U.S. War Bonds, deposits in building and loan associations, real estate, or any other personal assets not connected with the business of the N. Fourth Street market, other than some rental records. Barfield *247 audited Axler's accounts for the year 1949 on the basis of all of the available records. Barfield continued his engagement with Axler during part of 1950, writing up his cash journal from the the cash register tapes, preparing his checks and handling his correspondence. In September 1950, the firm of Cherry, Bekaert and Holland, certified public accountants, commenced doing Axler's bookkeeping and accounting work. That firm, after audit, prepared the Axlers' 1950 return. Petitioners' counsel had requested Bekaert to undertake a detailed audit of Axler's books and records for the period 1943-1950 and an examination of the Federal tax returns filed for those years. Bekaert's firm examined the cash journals, check stubs and cancelled checks, bank statements and the available sales and inventory records for the period. On the basis of that examination, Axler's bank statements were reconciled and the various checks issued were traced to the proper expense or other account. The book entries were then traced to the tax returns. Bekaert found that all expenses and disbursements were supported by cancelled checks, with the exception of certain year-end cash disbursement entries that were *248 made by various bookkeepers. These amounted to some five or ten per cent of the total expenses of the year. The audit revealed no errors in the method of bookkeeping employed other than minor mathematical errors in computation. The audit, however, was limited to Axler's business records and did not cover Axler's investments. No completely separate records were kept by Axler for the second store which he operated for a two-year period during 1947-1949. Leon Axler would keep the adding machine tapes for the daily sales receipts and the invoices for purchases bundled together, sometimes for as long as a week, and then post these figures along with the like figures from the 909 N. Fourth Street store. These were sometimes lumped together in a single entry. This was particularly true when the posting had been delayed. No separate entries were made for sales from the second store in the daily memo books kept for store No. 1. Any daily memo books that may have existed and been kept for store No. 2 have been lost. Interest income was not reflected in Axler's books and records. Axler's rental receipts were in the first instance recorded by himself or Leon in a separate small memo book. *249 Memoranda by Axler himself were in Hebrew, while those of Leon were in English. These various figures were accepted by Blackwell and Axler's other accountants and bookkeepers. The rental income was recorded, during most of the years (to the extent that it was recorded at all), in Axler's business books and records on the basis of notations in the small memo book. No rental entries appear in the journals for 1947, except in the month of December for which a single entry of $3,007.50 appears. No entries at all appear in the journal for rental income for the year 1948. Rental income received in the first six months of 1949 was recorded by individual months but no entries appear for the months of July, August, September, October or November, the income for the last six months of 1949 having been recorded in a single entry in the month of December as $2,775.50. No card file was maintained on Axler's rental properties. Bekaert was unable to fully check Axler's rental income. It was Axler's practice to deposit his rental receipts in a separate bank account (apart from his general business account) at the Security National Bank until such time as he needed more money in his grocery business, *250 which money he drew out of the rental account. Blackwell, who prepared Axler's income tax returns for 1944 through 1948, went over them item by item with Axler. Barfield, who prepared an audit report for 1949 and Axler's income tax return for that year, read both to Axler in detail. On several occasions Axler's accountants pointed out to him that there should be a general ledger, which would not only make the work of the accountant easier, but would enable them to prepare balance sheets which would reflect all of his assets and permit them to compare the year-end figures of successive years for purposes of reconciliation with the transactions occurring during the year. Blackwell was unable to get the information necessary for a general ledger. Petitioner's books and records showed substantial overdrafts in the cash on hand account in each year without disclosing the source of the funds from which the overdrafts were paid. Petitioner was also told on a number of occasions that because of the over-all size of his business he needed a full-time bookkeeper, and that his books were not sufficiently complete and extensive. None was ever hired. Facts Relating to Cash on Hand at *251 the Beginning of the Net Worth Period and at the End of Each of the Years of Such Period In 1928, Axler bought a large safe for his store. The safe has been located in the back of the store ever since. Prior to 1940, Axler kept whatever cash or other valuables he may have possessed in this safe. In 1940, he first opened a bank account. In 1942, upon the urgings of several people who considered it unsafe to keep sums of money in the safe at the store, Axler rented a safe deposit box in the Wilmington branch of the Security National Bank. At that time Axler transferred all of his savings, mainly cash, from the safe to the safe deposit box. Axler's business was prosperous from the first. Numerous persons saw what appeared to them to be large sums of money in the taxpayer's safe in his store prior to 1943. In 1943, Axler and his wife were engaged in a family dispute. Axler's wife had employed an attorney and Axler feared that his wife would attempt to attach the assets he kept in his safe deposit box. As a consequence, he took $20,000 from the safe deposit box and, for safekeeping, brought the money in a box to F. E. Livingston, a longtime friend of Axler and a businessman, leaving *252 enough funds, however, in the safe deposit box with which to carry on the business. Livingston counted the money and gave Axler a receipt therefor. After two or three weeks Axler returned and took back the $20,000. In the fall of 1945, Albert Axler took $15,000 in a paper bag to the Security National Bank of Wilmington and requested the vice president of the bank, Rorison, to personally count the money. Rorison did so. The money was left for the time being in the custody of the bank. (The ultimate use to which it was applied is not made clear in the record.) For some time prior to 1943, Axler owned a small farm on the outskirts of Wilmington where he would slaughter animals to be sold later in the meat department of the N. Fourth Street market. Axler, however, had a strong desire to build his own abattoir in Wilmington. Prior to 1943, Axler discussed his ambition with F. E. Livingston, who was then handling Axler's insurance and was a friend and confidant. They contemplated at that time a probable cost of some $50,000 to $70,000. Axler also discussed the construction of an abattoir on a number of occasions prior to 1943 with W. C. Haas, a sanitation engineer and the local public *253 health inspector. On one such occasion, Haas and Axler drew up a few rough pencil sketches, discussed the location of the plant, the size and the type of building, the necessary equipment, and in general, the operation of an abattoir. They also discussed cost figures, but only generally and not in any detail. They considered that the probable cost of the type of slaughter house Axler proposed would be approximately $80,000 to $90,000. Axler, however, did not undertake in 1943 or any year thereafter to have an abattoir built, although some time around 1945 or 1946 he did purchase a farm of some 40 or 50 acres through his friend Livingston for that purpose. Axler still possessed that property at the end of 1950. He was unable to utilize it for the purpose for which it was bought, however, because of its location near the Cape Fear River. Subsequently, during 1946 he purchased other realty in nearby Brunswick County with a view to using it for building an abattoir. About the same time, he also purchased sundry equipment worth between $12,000 and $15,000 for $6,000, which equipment he still possesses and is in usable condition. In the fall of 1945, Axler sought the advice of Rorison, *254 vice president of the Security National Bank of Wilmington, concerning the construction of a slaughterhouse and meat packing plant. Rorison strongly advised Axler against building an abattoir because of the large investment required. Axler indicated, however, that he had sufficient funds in his safe deposit box with which to construct the proposed abattoir. Early in 1946, Axler moved somewhat more concretely to realize his ambition and placed an order through Haas with the Cincinnati Butcher Supply Company for certain abattoir equipment. The order was for approximately $50,000 worth of equipment. Once again, after being asked how he was to finance the expenditure, Axler indicated that he had sufficient cash to cover the order. The order, however, was never completed, since Axler, shortly thereafter, had Haas write Butcher Supply to cancel the order, having decided to hold off on the purchase until after certain undisclosed family problems were resolved. In 1948, Axler showed renewed interest in going forward with his plans to construct an abattoir. He went to Livingston to request help in arranging financing for the undertaking. He indicated that he had used the bulk of his savings *255 in the purchase of real estate. Livingston informed Axler that financing could be arranged without any difficulty considering Axler's sizable real estate holdings. Axler thereupon seriously entertained the possibility of finally building an abattoir. He once again discussed the matter with Haas and, in October 1948, Haas prepared floor plans, equipment lay-out, and refrigeration lay-out, including a quick freezing room and a cold storage room. Axler, with Haas, also inspected various sites suitable for construction of the abattoir. They also discussed the probable cost of the proposed equipment, around $50,000, and Axler indicated that he had made arrangements with Livingston to borrow sufficient funds to undertake the expenditure. On January 13, 1938, Axler submitted to the Security National Bank a statement showing cash on hand in the amount of $700 as of December 31, 1937. The statement was submitted in connection with a loan made by Axler in the amount of $400 on January 17, 1938. The bank did not, in connection with such loans, require a full showing of a borrower's assets, but only of his liabilities and of sufficient assets to cover the amount of the loan. Axler's 1937, *256 1938 and 1944 North Carolina State Franchise and Intangible Tax Returns showed cash on hand in the amount of $453.84, $263.59 and $601.55, respectively. The amounts so reflected were based upon the balance in Axler's general ledger account of his business records, less $300 allowed as an exclusion. Blackwell prepared these returns for Axler. A financial statement dated February 4, 1947, furnished by Axler to the Equitable Life Assurance Society through their agent, E. L. Mathers, in connection with an application for life insurance, revealed that Axler had $50,000 in Government bonds and cash. Certain U.S. Savings Bonds acquired by Axler in 1943 at a cost of $20,730 were included therein. We find with respect to the issue of fraud, that petitioner had cash on hand in an amount not exceeding $30,000 as of January 1, 1947; that at the end of 1947 and 1948 he had no substantial amount of cash on hand; and that at the end of the years 1949 and 1950 he had cash on hand in the respective amounts of $5,500 and $477.59. Overdrafts During the years in issue, the journal maintained by Axler as a part of his books and records showed sources of income only as receipts of rents and receipts *257 from the sale of merchandise from the grocery and meat market. No income from interest was reflected. The journal contained two cash accounts, one for cash on hand and the other for cash in banks. Additions to the cash on hand account consisted primarily of sales and rental receipts, recorded by debits to the account. Subtractions from the cash on hand account consisted of deposits in the bank and cash (currency) disbursements, representing items paid for in cash, recorded by credits to the account. The cash in the "cash in bank" account was debited for deposits in the bank and credited for disbursements by check. For the taxable year 1947, the cash on hand account was not used to record disbursements of currency for expenses and no entries were made to record deposits of cash except in the month of December, 1947. Overdrafts in the cash on hand account, that is, the excess of credits over debits to the account, appear as set out below by years. Year
Amount of Overdraft
1943
$ 2,867.79
1944
123.03
1945
216.39
1946
34,746.76
1947
48,276.12
1948
15,337.93
1949
16,088.46
1950
5,123.09
Total 1943-1950
[1] $122,779.57 *258 Overdrafts in the cash on hand account appear on Axler's records in many of the months in each of the years 1946, 1948, 1949 and 1950. No such overdrafts appear for the individual months in 1947 because the journal does not show entries on the credit side of the cash on hand account for that year. Overdrafts in the cash on hand account represent an excess of cash funds passing through the journal over the amount of recorded income from the specified sources of income indicated above. The source of the funds from which the overdrafts were paid was not recorded. In the late 1930's, Axler began to acquire a number of real properties and continued to do so during the years before us. The real estate purchased by Axler was generally paid for by checks drawn on the Security National Bank after the account was opened in 1940. In some instances simultaneous deposits in currency were made in amounts to cover the checks just issued for the purchase of real estate. In 1950, Axler borrowed $19,000 from the bank and deposited such amount immediately to his business account. Endowment policy proceeds were paid to Axler, as follows: 3-29-41
$ 164.42
3- 9-42
229.87
3-17-45
1,900.60
3-12-49
1,004.92
*259 In 1948, Axler received $5,600 as a condemnation award. Net Worth Computation Respondent's net worth computation for the period 1943-1950 is set out fully hereinafter as Schedule A. Numerous items included therein were stipulated by the parties at the time the computation was submitted in evidence and are given effect infra in Schedule B. Such items are identified by an asterisk. Petitioner's personal living expenses were thereafter stipulated at the end of trial in the amounts included in the net worth computation for all of the years other than 1949 and 1950. The amounts stipulated for such years were $6,409.42 and $5,781.52, respectively. These amounts are also reflected in Schedule B, infra. The respondent's "total assets" figures reflect an unlisted item of $10. Subsequent to trial, the parties stipulated that petitioner had such an amount on deposit at the Security National Bank in a savings account on January 1, 1943, and at the end of 1943 and each year thereafter up to 1950. The resulting adjustment is likewise reflected infra in Schedule B. SCHEDULE A
Albert Axler - Computation of Income for the Taxable years 1943,
1946, 1947, 1948, 1949, 1950 -
Net Worth Basis
1/1/43
12/31/43
12/31/44
12/31/45
12/31/46
Assets: Cash on Deposit
Security National
$ 7,360.77
$ 42.55
$ 3,879.02
$ 1,849.97
$ 4,269.51
Bank
* Security National
Bank
* Bank of Wilmington
* Cash on Deposit on
Real Property
* Interest Receivable
* Loans Receivable
Building and Loan
Investments
* Peoples Building
and Loan
* Cooperative
Building and Loan
* Citizens Building
and Loan
* Carolina Building
and Loan
* United States
20,730.00
20,730.00
20,730.00
20,730.00
Savings Bonds
* Merchandise
7,764.94
12,931.07
5,269.83
5,987.96
12,477.52
Inventory
Prepaid Expenses
Real Property and
10,212.06
10,712.06
15,562.06
25,512.06
49,312.06
Improvements
* Automobile -
50.00
50.00
50.00
50.00
50.00
Personal
* Delivery Equipment
850.00
850.00
850.00
850.00
850.00
* Store Equipment and
Fixtures
Total Assets
$26,247.77
$45,325.68
$46,350.91
$54,989.99
$87,699.09
Liabilities: Reserve for
Depreciation
Buildings and
$ 548.46
$ 656.74
$ 809.02
$ 1,136.96
$ 1,776.90
Improvements
Delivery Equipment
311.67
481.67
651.67
821.67
850.00
Store Equipment and
Fixtures
Accounts Payable
* Taxes Payable
* Notes Payable
Total Liabilities
$ 860.13
$ 1,138.41
$ 1,460.69
$ 1,958.63
$ 2,626.90
Total Assets
$26,247.77
$45,325.68
$46,350.91
$54,989.99
$87,699.09
Less: Total
860.13
1,138.41
1,460.69
1,958.63
2,626.90
Liabilities
Net Worth
$25,387.64
$44,187.27
$44,890.22
$53,031.36
$85,072.19
Increase in Net Worth
$18,799.63
$ 702.95
$ 8,141.14
$32,040.83
Add: * Federal Income
2,686.00
846.11
2,873.12
6,362.91
Tax Paid
* Life Insurance
3,919.25
3,175.89
2,839.81
2,778.44
Premiums Paid
Personal Living
4,416.78
3,678.27
3,422.10
5,512.40
Expenses
Total
$29,821.66
$ 8,403.22
$17,276.17
$46,694.58
Less: * Federal
1,357.17
Income Tax Refunds
and Credits
$29,821.66
$ 7,046.05
$17,276.17
$46,694.58
* Itemized or
598.18
500.00
500.00
980.78
Standard Deduction
Corrected Net Income
$29,223.48
$ 6,546.05
$16,776.17
$45,713.80
*260 SCHEDULE A
Albert Axler - Computation of Income for the Taxable years 1943,
1946, 1947, 1948, 1949, 1950 -
Net Worth Basis
12/31/47
12//31/48
12/31/49
12/31/50
Assets: Cash on Deposit
Security National
$ 5,281.29
$ 1,714.78
$ 491.69
$ 2,281.75
Bank
* Security National
418.14
1,004.34
Bank
* Bank of Wilmington
910.60
* Cash on Deposit on
200.00
Real Property
* Interest Receivable
275.00
240.00
240.00
* Loans Receivable
435.00
1,075.01
670.01
Building and Loan
Investments
* Peoples Building
5,000.00
5,000.00
5,000.00
and Loan
* Cooperative
5,000.00
5,000.00
5,000.00
Building and Loan
* Citizens Building
5,000.00
and Loan
* Carolina Building
6,000.00
6,000.00
6,000.00
and Loan
* United States
20,730.00
31,090.00
31,090.00
20,730.00
Savings Bonds
* Merchandise
35,723.57
19,358.01
17,164.61
34,073.80
Inventory
Prepaid Expenses
1,588.02
1,092.52
Real Property and
57,375.44
67,375.44
73,125.44
90,987.04
Improvements
* Automobile -
50.00
50.00
50.00
50.00
Personal
* Delivery Equipment
850.00
850.00
1,679.05
3,611.00
* Store Equipment and
585.55
13,112.87
19,356.18
19,938.68
Fixtures
Total Assets
$120,605.85
$156,181.70
$162,288.14
$190,889.14
Liabilities: Reserve for
Depreciation
Buildings and
$ 2,697.01
$ 3,879.08
$ 5,184.15
$ 6,781.45
Improvements
Delivery Equipment
850.00
850.00
925.90
500.59
Store Equipment and
36.17
408.24
2,219.69
4,179.80
Fixtures
Accounts Payable
7,507.53
4,634.50
* Taxes Payable
49.48
* Notes Payable
19,000.00
Total Liabilities
$ 3,583.18
$ 12,644.85
$ 8,329.74
$ 35,145.82
Total Assets
$120,605.85
$156,181.70
$162,288.14
$190,889.14
Less: Total
3,583.18
12,644.85
8,329.74
35,145.82
Liabilities
Net Worth
$117,022.67
$143,536.85
$153,958.40
$155,743.32
Increase in Net Worth
$ 31,950.48
$ 26,514.18
$ 10,421.55
$ 2,084.92
Add: * Federal Income
1,669.61
800.00
200.00
400.00
Tax Paid
* Life Insurance
7,041.81
5,503.48
5,163.69
5,455.47
Premiums Paid
Personal Living
2,644.24
5,717.44
6,827.56
6,785.86
Expenses
Total
$ 43,306.14
$ 38,535.10
$ 22,612.80
$ 14,726.25
Less: * Federal
3,689.65
800.00
Income Tax Refunds
and Credits
$ 39,616.49
$ 37,735.10
$ 22,612.80
$ 14,726.25
* Itemized or
500.00
1,000.00
1,000.00
1,000.00
Standard Deduction
Corrected Net Income
$ 39,116.49
$ 36,735.10
$ 21,612.80
$ 13,726.25
*261 Our Findings of Fact with respect to those items which have not been stipulated are set forth below, and are reflected in Schedule B. 1. Cash on Deposit - Security National Bank - Business Account Respondent's net worth computation included in petitioners' assets certain bank balances in the Security National Bank as reflected in the bank's ledger at the end of each year. The balances are not reconciled and give no effect to checks outstanding as of the last day of each year. The figures set out below represent in the left-hand column those figures shown in the bank statements and utilized by respondent in preparation of his net worth computation, and in the right-hand column such figures as they would be if they were reconciled. Bank Balance Per
Balance Per
Date
Bank Statement
Reconciliation
1- 1-43
$7,360.77
$7,360.77
12-31-43
42.55
(77.95)
12-31-44
3,879.02
3,698.79
12-31-45
1,849.97
1,680.65
12-31-46
4,269.51
(98.97)
12-31-47
5,281.29
4,113.19
12-31-48
1,714.78
139.91
12-31-49
491.69
(3,114.82)
12-31-50
2,281.75
2,534.34 Petitioners' effective bank balances as of the end of each year of the net worth period were in the *262 amounts shown in the above right-hand column. 2. Prepaid Expenses At the end of the years 1949 and 1950, Axler had prepaid expenses in the amounts of $1,588.02 and $1,092.52, respectively, as included in respondent's net worth computation. These figures are reflected in Axler's books and records. 3. Real Property and Improvements Axler possessed real property and improvements thereon, includible in his net worth at the end of each of the years 1943-1950 as follows: Year
Land
Buildings
Improvements
Total
1943
$ 5,505.00
$ 5,207.06
$10,212.06
1944
7,155.00
8,407.06
15,562.06
1945
12,105.00
13,407.06
25,512.06
1946
23,605.00
25,707.06
49,312.06
1947
27,348.57
28,257.06
$1,769.81
57,375.44
1948
30,248.57
35,357.06
1,769.81
67,375.44
1949
32,998.57
38,357.06
1,769.81
73,125.44
1950
38,085.57
51,131.66
1,769.81
90,987.04
4. Reserve for Depreciation Petitioners' total claim for depreciation on buildings and improvements, delivery and store equipment, and fixtures in each of the years 1943-1950 is compared with respondent's determination of allowable depreciation in his net worth computation. We find the *263 facts as determined by respondent. Net Worth
Respondent's
Difference
Returns
Reserve for
effective
between Amount
Amount Claimed
Depreciation
Allowance Each
Claimed and
Yearly
(cumulative)
Year
Amount Allowed
1943 (1/1)
$ 860.13
1943
$ 220.00
1,138.41
$ 278.28
$ (58.28)
1944
334.31
1,460.69
322.28
12.03
1945
618.17
1,958.63
497.94
120.23
1946
1,287.51
2,626.90
668.27
619.24
1947
1,812.79
3,583.18
956.28
856.51
1948
2,378.89
5,137.32
1,554.14
824.75
Reserve
1949
3,316.06
$ 8,727.57
8,329.74
3,192.42
123.64
1950
4,264.33
12,807.90
11,460.84
3,131.10
1,133.23
Total
$14,032.06
$10,600.71
$3,631.35
5. Accounts Payable At the end of the taxable years 1948 and 1950, Axler had accounts payable in the amounts of $7,507.53 and $4,634.50, respectively, which have been reflected in respondent's net worth computation, and are in accordance with Axler's books and records. 6. Cash on Hand We find for the purpose of computing petitioners' deficiencies in the years 1947-1950 that petitioner had cash on hand as follows: January 1, 1947
$29,270.00
December 31, 1947
0
December 31, 1948
0
December 31, 1949
5,500.00
December 31, 1950
477.59
*264 Such amounts are given effect infra in Schedule B. SCHEDULE B
Abridged Net Worth Statement (including Nondeductible Expenditures) and
Unreported Net Incomee as Adjusted (See Findings supra)
1-1-47
12-31-47
12-31-48
12-31-49
12-31-50
Net Worth
$109,973.71
$115,854.57
$141,961.98
$155,851,89
$156,463.50
Increase in
Net Worth
5,880.86
26,107.41
13,889.91
611.61
Corrected
Net Income
13,046.87
36,328.33
24,663.02
11,248.60
Unreported
Net Income
15,420.45 *
34,033.23
16,870.34
657.25
Fraud A substantial part of the deficiency for each of the taxable years 1947, 1948 and 1949 was due to fraud with intent to evade Federal income taxes and each of the returns filed for the years 1947 and 1949 was false and fraudulent with intent to evade tax. Opinion FISHER, Judge: Statute of Limitations Axler (for convenience referred to hereinafter as petitioner) contends that assessment and collection of any deficiencies in income taxes for the years 1943, 1946, 1947, 1949 and 1950, are *265 barred by the statute of limitations. The pleadings do not raise such issue in respect to the taxable year 1948, the statutory notice of deficiency for said year having been sent on March 14, 1952, within the normal three-year period of limitations from the filing of the return for that year. The statutory notice of deficiency in respect to each of the years 1943, 1946 and 1947 was mailed on February 18, 1954, and a separate notice for the years 1949 and 1950 was mailed on the same date. The notice for 1950 was timely sent. The deficiency notice for 1949 was sent more than three but less than five years after the filing of the return for 1949. Accordingly, the period of limitations for such year had not run if there was omitted from gross income an amount properly includible therein in excess of 25 per cent of the amount of gross income stated in the return within the meaning of section 275(c), or if the return so filed was false or fraudulent with intent to evade tax. The years 1943, 1946 and 1947 are clearly barred by limitations except upon proof by the respondent that the returns filed for such years were false and fraudulent with intent to evade tax in accordance with section *266 276(a). Our Findings of Fact reflect our view, discussed hereinafter, that respondent has established that the returns filed for 1947 and 1949 were each false and fraudulent with intent to evade tax. On the other hand, our holding (likewise to be discussed later) with respect to the returns for the years 1943 and 1946 is to the effect that neither of said returns has been shown to have been false or fraudulent with intent to evade tax. Accordingly, the statute of limitations bars assessment and collection of any deficiency for 1943 and 1946, but does not do so in respect to each of the years 1947 and 1949. We note that since we have found that the return for 1949 was false and fraudulent with intent to evade tax, it is unnecessary to consider respondent's alternative contention that in respect to the taxable year 1949 the five-year period of limitations provided for in section 275(c) would also be applicable on the theory that petitioners reported as gross income $27,552.72 and omitted from their return an amount which was properly includible therein in excess of 25 per cent of the reported gross income. See H. Leslie Leas, 23 T.C. 1058 (1955); John E. Goodenow, 25 T. *267 C. - (filed October 6, 1955). If it were necessary to consider the issue, however, we think it quite evident from our Findings of Fact that petitioners omitted an amount from gross income which was in excess of the required 25 per cent, and that the bar of the statute of limitations would not apply. Adequacy of Accounting Records and Application of Net Worth Method Before considering the fraud issue specifically, we will discuss petitioner's contention that his books and records were adequate as a basis for determining income, and that respondent is for that reason precluded from resorting to the so-called net worth plus nondeductible expenditures method to show substantial understatements of income or as evidence of corrected net income. While, as discussed infra, we do not agree that respondent's right to use the net worth approach is dependent upon some patent defect in the books and records of the taxapyer, we think it clear that, if reasons must be assigned, they are ample in the instant case. The books show substantial overdrafts in the cash on hand account in all years in issue without disclosing the source from which such overdrafts were paid. While this fact alone does *268 not establish understatement of income or unreported sales, it is quite suggestive of those possibilities, and is an invitation to an audit on some basis which will bring the facts to light. Moreover, for all years except 1950 and part of 1949, petitioner did not maintain a general ledger, and in some years the books and records did not show investments in bonds and real estate. The absence of such records are suggestive of the need to use an approach which will test the accuracy of the books and records, permit comparisons between years and between the beginning and end of particular years, and show the correct amount of his income. We think, under these circumstances, that the net worth technique was fully justified and was appropriate to the problem presented. As indicated above, however, the right of respondent to resort to the net worth method is not dependent on finding first (and without regard to the implications of the net worth computation) that Axler's books and records were not sufficient to properly reflect income. In Estate of W. D. Bartlett, 22 T.C. 1228 (1954) we held that even where the taxpayer presents a set of books which appear to be superficially *269 adequate, the so-called net worth method may be resorted to and applied in order to show a substantial variance of actual income with reported income and thereby suggest the untrustworthiness of the books as a whole. We quoted from Morris Lipsitz, 21 T.C. 917, 930 (1954) affd. (C.A. 4, 1955) 220 Fed. (2d) 871, certiorari denied 350 U.S. 845, as follows: "when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" This view recognizes that the so-called net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer in keeping his books. By a showing *270 of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy as being attributable to gifts, inheritances or other nontaxable receipts, the so-called net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912 (1954); Estate of George L. Cury, 23 T.C. 305 (1954)., Harry Gleis, 24 T.C. 941 (filed August 29, 1955). We note the Supreme Court's remarks in these respects in Holland v. United States, 348 U.S. 121 (1954): "The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent *271 than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * *" We need not, therefore, be concerned with finding particular inaccuracies, omissions or inconsistencies in the taxpayer's books. Such may or may not exist and may or may not be discernable. It is sufficient that under the circumstances of this case substantial understatements of income in the years so found are sufficiently established through the use of net worth technique. Fraud Issue Respondent contends that the return filed for each of the years 1943 and 1946-1950 was false or fraudulent with intent to evade tax within the meaning of section 276(a), and also that a part of the deficiency determined for each of these years was due to fraud with intent to evade tax within the meaning of section 293(b). The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing evidence to that effect. Arlette Coat Co., 14 T.C. 751 (1950); *272 Henry S. Kerbaugh, 29 B.T.A. 1014 (1934), affd. (C.A. 1, 1935) 74 Fed. (2d) 749. It should be noted at the outset that our conclusions in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002 (1954); Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Co., 25 B.T.A. 419 (1931). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some respects upon circumstancial evidence. Furthermore, in such circumstances, it is unlikely that the taxpayer's own testimony may be directly contradicted. We are not bound to accept it if it is "highly improbable or manifestly unreasonable," Carmack v. Commissioner, supra; Herbert v. Riddell, (D.C.S.D. Calif., 1952) 103 Fed. Supp. 369. The necessity of a through and careful consideration of the record as a whole is thus significantly indicated. Respondent's proof of fraud by the method upon which he here relies must include proof of opening net worth with reasonable *273 accuracy. We note the language of the Supreme Court in Holland v. United States, supra, where it was said: "We agree with petitioner that an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * *" Respondent's net worth computation was introduced into evidence without objection although it was made clear that some of the items are in dispute, including the very significant factor of omission of any opening cash on hand. It also includes a number of items on which, as set forth in our Findings of Fact, the parties are in agreement. Each item in dispute is discussed infra in relation to the issue of deficiencies. We have approved all such items as included by respondent in his net worth computation except as otherwise hereinafter indicated. One of such items, the bank balances in Axler's business account at the Security National *274 Bank, fully discussed infra, has been adjusted in accordance with the proof of petitioner to reflect reconciled figures as distinguished from the year-end balances shown on the bank records. Another, and, as a practical matter, the most significant item, is that of cash on hand. Petitioner claims to have had in excess of $90,000 in undeposited cash on hand at the beginning of the first net worth period. Respondent has not credited petitioner with any cash on hand in his net worth computation as of either the beginning or end of any of the years in issue. Respondent has the burden of establishing his position, at least in sufficient substance to demonstrate fraud, by clear and convincing evidence. See Frank Imburgia, supra. We will take up the year 1943 first. In respect to such year we think that respondent has not established his opening net worth by clear and convincing evidence. Respondent urges that certain of Axler's actions prior to 1943 are so inconsistent with his claim that he possessed large accumulated sums of money as to indicate the unreasonableness of the claim. Respondent points to the borrowing of small amounts of money by Axler prior to such date, the *275 borrowing of money on his insurance policies, the purchase of relatively inexpensive delivery equipment on an installment basis and the statement of only very small amounts of cash on hand by petitioner in certain of his State tax returns. While such evidence may properly be considered in determining the presence or absence of a substantial accumulation of cash, it is not convincing when we are likewise presented with the testimony of credible witnesses who state that for many years prior to 1943, and specifically during 1942, they saw large sums of money in Axler's safe, coupled with the specific and detailed testimony by one such witness, Livingston, concerning the deposit with him of $20,000 in cash by Axler for safekeeping in 1943. Axler had taken this money from his safe deposit box at the Security National Bank and had brought it to Livingston for safekeeping during a family dispute. A few weeks afterwards, Axler returned to collect the money. We think that Livingston's testimony covering the foregoing is not to be doubted or disregarded. Further, this is substantial evidence in the record (other than the testimony of Axler himself) of Axler's desire to build an abattoir and *276 his repeated assertions antedating the arising of any of the issues before us that he had available sufficiently large sums of money with which to do so. Finally, there is the purchase by Axler during 1943 of $20,730 of United States bonds. In sum, we do not think that it has been shown by clear and convincing evidence that Axler had little or no cash on hand at the beginning of the year 1943 as determined by respondent in his net worth computation. To the contrary, it appears quite clearly from the record that Axler did possess a substantial amount of undeposited cash on January 1, 1943, all of which was part of an alleged cash hoard on hand at that time of some $90,000. Accordingly, it is held that respondent has not sustained his burden of proving his opening net worth as of January 1, 1943. Respondent argues further that whatever amount of cash on hand is considered by the Court to have been shown to exist as of January 1, 1943, should also be considered as being on hand at the end of 1943, thereby leaving intact the deficiency as determined. We point out that we have not held that any particular amount of cash was proved to exist at the beginning of the net worth period, but *277 have held merely that respondent has not satisfied his burden of proving by clear and convincing evidence that a substantial amount of cash did not so exist on the opening date of the net worth period. Nevertheless, if respondent is to sustain his alternative position, he must show by clear and convincing evidence that such cash as may have existed on January 1, 1943, still existed at the end of 1943. We find no evidence in the record which discharges such burden. As already stated, petitioner purchased $20,730 in U.S. War Bonds in 1943. While the record is not altogether clear regarding petitioner's claim that these bonds were purchased with the $20,000 he had left with Livingston, we think that it does tend to support such claim, at least sufficiently to leave us unconvinced as to the continued existence of such amount in cash at the end of 1943. Livingston testified that he told Axler to purchase bonds with the funds after he returned them to Axler. Axler himself confirmed the fact that Livingston had told him to purchase bonds with the money, and it seems to us to be a reasonable inference from his testimony that he had followed such advice. Respondent, on the other hand, has *278 offered no evidence to show that the source of the cash for the purchase of the bonds was an income source or other than petitioner's alleged cash accumulation. Absent any such proof, we must hold that respondent has failed to establish his hypothetical alternative proposition that whatever cash petitioner had on hand at the beginning of 1943 was still on hand as cash at the end of that year. We consider next whether respondent has established an opening net worth as of January 1, 1946, the years 1944 and 1945 (for which respondent determined overpayments of tax) not being in issue. We think that the evidence of record applicable to the year 1946 in this regard is likewise insufficient. The various actions of petitioner prior to 1943 which respondent pointed to as indicating that petitioner could not have had and did not have a substantial amount of cash on hand at the beginning of 1943 are no longer significant, since, as we have indicated, petitioner did have a large accumulation of cash on that date. All of the available evidence relative to cash on hand points again to the existence of a substantial amount of cash as of January 1, 1946. In any event, there is nothing in the record *279 which evidences an absence of any substantial amount of cash on hand as of that date. In the fall of 1945, Axler brought $15,000 in cash to the Security National Bank and requested the vice president, Harmon A. Rorison, to count the money personally. The money was left in the custody of the bank according to the testimony of Rorison, but there is nothing in the record to show the deposit of such a substantial sum of money in 1945 or at any time prior to January 1, 1946, or the purchase of any bonds during that time. While the evidence indicates that during 1945 petitioner increased his net holdings of real estate in the amount of $9,950, only $450 was expended therefor between the fall of 1945 and January 1, 1946. Furthermore, in the fall of 1945 Axler consulted Rorison about building an abattoir. Rorison advised him against undertaking such construction because of the very large expense involved. Axler, however, indicated to Rorison that he had sufficient funds in his safe deposit box to do so. Then, early in 1946, Axler placed an order for abattoir equipment in the approximate amount of $50,000. When queried as to how he intended to finance the purchase, he indicated that he had *280 sufficient cash to cover the order. The purchase, however, was not completed, it appears, because of some family difficulties. About this same time, however, Axler did purchase sundry equipment for about $6,000. Again we think that the record as a whole can only be fairly interpreted as showing that Axler had a substantial amount of cash on hand at the beginning of 1946. And again we think that respondent has failed in his burden of proving the absence of cash in his effort to establish an opening net worth for petitioner. Likewise, we think that respondent has not shown, and we are unable to assume, that the cash which petitioner had on hand at the end of 1946 was the same as that which he had on hand at the beginning of the year with the result, as argued by respondent, that the items cancel out each other the same as if each were zero. It must be remembered that a net worth statement is an indirect reconstruction of income by showing increases in assets over liabilities plus nondeductible expenditures. Unless the elements are accurately attributed to the appropriate period, therefore, a net worth computation is open to the tendency to distort and to shift from year to year the *281 actual earnings of the taxpayer in accordance with his form and manner of spending. Accordingly, it is necessary that the respondent establish both the taxpayer's opening and closing net worth by clear and convincing evidence if there is to be proper assurance that the correct amount of income will be attributed to the correct years of the net worth period and that the assets (or nondeductible expenses) emerging in the years covered by the net worth statement were not derived from cash accumulated before the beginning of the net worth period. Since respondent has failed to establish these facts, we must hold that he has failed to meet his burden of proof of fraud for the year 1946, and that the bar of the statute of limitations applies to that year. We come then to the years 1947, 1948 and 1949. The record shows that on February 4, 1947, in connection with an application for life insurance, Axler furnished the Equitable Life Assurance Society, through their agent, E. L. Mathers, a financial statement showing that he possessed $50,000 in Government bonds and cash as of that date. Axler then owned $20,730 worth of U.S. bonds and the remainder of the $50,000, or $29,270, is attributable *282 to cash. We believe this financial statement to be substantially accurate, and likewise that the sum of $29,270 represents with reasonable accuracy the amount of cash petitioner had on hand as of January 1, 1947, and, therefore, must be recognized and accounted for in the computation of the opening net worth for that year. The validity of the net worth computation as finally determined by us depends on a showing that such amount represents at least substantially the maximum amount of cash on hand at the beginning of the 1947 period. Petitioner on brief states that "[this] financial statement was obtained from Axler four years prior to the time the government commenced its investigation." Referring further to the cash on hand, the brief adds: "It does not require a stretch of the imagination to assume that Axler had this same cash on hand as of December 31, 1946." We take this as an admission by petitioner that the amount is substantially accurate, and it is clear from the absence of any assertion to the contrary in this connection that petitioner does not claim or argue that the amount of cash was any greater as of January 1, 1947. We also point out that a comparison of the petitioner's *283 net worth increases from January 1, 1943, to December 31, 1947, with his reported income for that period tends to support our view that petitioner had on hand no more than approximately $30,000 on January 1, 1947. The only two possible sources for petitioner's increase in net worth over the period 1943 to 1947 are accumulated cash, which we have already indicated petitioner quite clearly had in substantial amounts, and unreported receipts. Taking petitioner's total increase in net worth over such period (in accordance with respondent's net worth computation and without regard to cash on hand), in the amount of $102,295.63, and subtracting therefrom petitioner's total reported income over such period, in the amount of $42,204.74, an increase in net worth of $60,909.89 remains attributable only to the expenditure of accumulated cash or unreported receipts. Assuming that the source of such increase in net worth was accumulated cash, which has been alleged and has been shown to have existed in substantial amounts, petitioner's alleged $90,000 accumulation would be exhausted except for $29,909.11, an amount which very closely equals what we think was the total amount of cash on hand at *284 the beginning of 1947, as based upon the evidence before us. In the light of the foregoing, we hold that respondent has established an opening net worth as of January 1, 1947. The record is not as clear as it might be as to whether the expenditure of the remaining accumulation of cash of not over $30,000 should be attributed entirely to the year 1947 or part to 1947 and the remainder to 1948. Petitioner argues on brief that "the evidence concerning the abattoir indicates that Axler had invested the greater portion of his savings by 1948," [italics supplied], and that "[by] the end of 1948 Axler had almost all of his cash savings tied up in investments." The record clearly shows that during this period Axler was purchasing substantial real estate. In 1948 when he went to Rorison to discuss the building of an abattoir, he indicated that he had already used the bulk of his cash savings and that financing would be required. More significant, however, in our opinion, is the over-all tenor of the evidence to the effect that petitioner constantly utilized his cash accumulation whenever necessary to provide for his purchases of real estate and other assets. After a careful examination *285 of the entire record, we are convinced that Axler used the balance of his cash accumulation of not more than $30,000 pro tanto as the source of funds for his increases in assets in 1947. In all events, from the standpoint of the fraud issue, the only practical effect of allocating some part of the cash to 1948 would be to increase the understatement for 1947 and decrease it for 1948. In either event, the understatement is substantial for both years. Petitioner's assets increased during 1947 in the following amounts for the items specified: 1. Bank balance (December 31, 1947)
$ 4,212.16
(See discussion infra regarding
use of reconciled figures.)
2. Real property and improvements
8,063.38
3. Merchandise inventory
23,246.05
4. Store Equipment and fixtures
585.55
Total
$36,107.14 In addition thereto, petitioner incurred net nondeductible expenses (after deduction of a Federal income tax refund or credit and an allowance for the standard deduction) in the amount of $7,166.01, attributable to income taxes, life insurance premiums and living expenses. Since petitioner's increases in assets during 1947 alone exceed by some $6,000 the amount of cash he had on hand *286 as of the beginning of that year, we think that the record supports the inference that Axler exhausted during that year the $30,000 on hand at its beginning. As indicated above, from the perspective of the fraud issue, the validity of the inference is not determinative. Petitioner reported on his income tax return for 1947 a loss in the amount of $2,373.58. It is quite clear from the above indicated increase in petitioner's assets and his nondeductible expenditures (less specified items), less the liabilities allowed in the respondent's net worth computation, that petitioner understated his income for 1947 by a substantial amount, as disclosed by Schedule B in our Findings of Fact, which likewise discloses substantial understatements for the years 1948 and 1949. We think it is clear upon consideration of the whole record that some part of the understatements in the years 1947, 1948 and 1949 were due to fraud and that the returns for those years were false and fraudulent with intent to evade taxes. The petitioner has emphasized his lack of education and his inability to read and write English. It is clear, however, that he was able to read, write and understand figures. He was also *287 able to operate a cash register and an adding machine. He was at all times the dominant factor in running his business. He made most of the purchases, took an active part in calculating the inventory, and arranged for insurance. He handled all of his real estate purchases, managed the properties, collected the rents, and kept account of the rents in a notebook. He was undoubtedly aware of the substantial increases in his real estate holdings during the above three years as well as the large addition to inventory in 1947. He also must have known of his personal living expenses and the sizeable increase in life insurance premiums over 1946. He also exhibited a knowledge of the sources and availability of funds which he utilized for investments and business purposes. In testifying with respect to his cash hoard of over $90,000 claimed to have been accumulated prior to January 1, 1943, he asserted that he knew the precise amount within from $300 to $500. He questioned the correctness of his 1942 return which showed income of a little over $2,000. When the witness Barfield read over to Axler his audit report for 1949, Axler immediately noted the absence of an item for his bonds. In his *288 various discussions concerning the building of an abattoir, Axler knew and distinguished the times at which he could pay in cash from the later time when he required financing. In addition to the affirmative, though circumstantial, evidence that he kept close touch with his affairs and at all times knew what was going on with respect to his business and investments, we note that when he testified in the case, he not only did not deny that there were understatements of income in 1947, 1948 and 1949, but did not assert that he was unaware of them. He could hardly have claimed ignorance of what was in his returns, because his witness Blackwell, the public accountant who prepared his 1947 and 1948 returns, testified that he went over each return with Axler, item by item, including the schedules. Barfield, the certified public accountant who prepared his 1949 return, testified to substantially the same effect. We must remember, also, that Axler claimed recollection of clearing $5,000 to $6,000 a year during the early years of the operation of his store, indicating further the close attention he paid to his earnings. In the light of the foregoing, we have no difficulty in finding that *289 in 1947, 1948 and 1949 Axler was well aware of his approximate income and of the substantial understatement thereof in his returns for those years. There are, however, further indicia of fraud in the three years under discussion. In each of them there were substantial overdrafts in the cash on hand account, (in the respective amounts of $48,276.12 for 1947, $15,337.93 for 1948 and $16,088.96 for 1949 as testified to by petitioner's accountant). The source of the funds out of which the overdrafts were paid, however, is not recorded. The source could have been unrecorded business receipts or unrecorded investment income, or both, in which case the inference of fraud would be clear. It could have been attributable to inheritance, gift, borrowings, unrecorded cash on hand, or the like, none of which would constitute income. We must take into consideration, however, the fact that although Axler, two of his children, and his accountants took the stand on his behalf, the only explanation of a source other than income is the approximate $30,000 of cash on hand as of January 1, 1947, for which appropriate adjustment has been allowed in our Findings. We think it is reasonable to infer that *290 if there was a source of funds other than income which would have accounted for such overdrafts, such source would have been brought to our attention. Frank Imburgia, supra.The total of such cash overdrafts for the three years ($79,702.51) is so substantial that the failure to record or explain the source is quite significant. We further note that in 1947 petitioner made only a single entry in his books for rental income in the amount of $3,007.50, the entry being made in December. Such amount was reported on his 1947 income tax return as the total of rental income received for the year 1947. The amount is some $3,000 less than the $6,430.66 reported in the previous year when petitioner owned a substantially lesser amount of rental properties. He did report rental income of $6,334.25 for 1948 and $5,982.90 for 1949, but in these years his real estate investments were substantially larger than in 1946, and it is significant that no entries appeared on his books in 1948 or in the first six months of 1949. It is to be remembered, also, that Axler himself kept the records of his rental receipts. In the light of all of the circumstances, and upon the record as a whole, *291 we think that respondent has established by clear and convincing evidence that petitioner underreported his income for 1947, 1948 and 1949 in a substantial amount and that he was well aware of his approximate income and the understatement thereof for those years. It follows, therefore, that for each of those years some part of the deficiency was due to fraud, and that the returns for the years 1947 and 1949 were false and fraudulent with intent to evade taxes. We come now to the year 1950. After adjustments reflecting all of the appropriate changes in respondent's net worth statement, as set forth in our Findings of Fact, supra, and discussed infra in relation to our determination of deficiencies, we find that the understatement for 1950 was only $627.25. In view of the small amount of the understatement, resulting in a deficiency in an insignificant amount, we think an extended discussion from the standpoint of fraud is not warranted. We think it sufficient to say that we have carefully considered the facts and that we have concluded that respondent has not established fraud for 1950 by clear and convincing evidence. In disposing of the fraud issues, it is necessary for us to *292 consider two questions of evidence. The first arises out of respondent's offer, over petitioner's objection, of proof of Axler's conviction of tax fraud for the years 1946 to 1950, inclusive, upon his plea of nolo contendere. We received the evidence conditionally, subject to motion to strike and argument on brief. From the standpoint of admissibility, as distinguished from weight, we have previously held in Lillian Kilpatrick, 22 T.C. 446 (1954) affd. (C.A. 5, 1955) 227 Fed. (2d) 240, that such evidence was admissible as reflecting upon the credibility of the petitioner as a witness, and we so hold here. In fact, however, we have given no weight to the evidence from the perspective of credibility because of the circumstances under which the plea was entered. Axler's then counsel testified that the plea had been entered on his advice; that he had had no experience in such cases, but had advised the plea because he had been unable to prepare for Axler's defense; was unable to arrange a postponement until the books were audited or until experienced tax counsel could be employed, and because he was assured that upon such plea the matter would be brought up *293 in Wilmington, N.C., which would be helpful to Axler because the businessmen there would testify for him. We were impressed with the high personal character and sincerity of the witness, and we believe his testimony. The further question is raised as to whether the plea and conviction should be received as evidence tending to establish fraudulent intent. We reserved decision on a like point in Lillian Kilpatrick, supra, and we do so here. If admissible as reflecting on the issue of fraudulent intent, we nevertheless do not think the evidence would in any way be binding and the question of weight would be for us. Eugene Vassallo, 23 T.C. 656 (1955); cf. Thomas J. McLaunghlin, 29 B.T.A. 247 (1933). We would give it no weight, however, because of the circumstances already recounted. We point out that we have held in favor of the petitioner on the fraud issue for the years 1946 and 1950, despite the plea, for the reasons already discussed. It is likewise apparent that our determination of the fraud issues in favor of the respondent for the years 1947, 1948 and 1949 was for the reasons which we have fully set forth supra without support from or *294 consideration of the plea. One further problem of evidence requires attention. Respondent objected to testimony covering conversations with and statements made by Axler reflecting upon his desire to build an abattoir, the probable cost thereof, and whether, at varying times, he could have paid for the abattoir in cash or would have to arrange for financing. We think the testimony was admissible as in the nature of verbal acts of Axler in the ordinary course of his affairs occurring at times when his declarations were not selfserving. We may add that with respect to the years 1943 and 1946, in which we held against respondent on the fraud issue, our substantial basis, as shown by our discussion, supra, was respondent's failure to establish opening net worth. With respect to the year 1950, in which we also held that fraud was not established, it is likewise clear from our discussion that the evidence concerning the abattoir was not a factor. On the other hand, while of little significance, the testimony concerning the abattoir was to a minor extent beneficial to respondent's case for the years 1947 to 1949, inclusive, in demonstrating Axler's activities and his apparent knowledge *295 and understanding of his financial affairs at various times. Deficiencies Respondent's net worth computation includes a very large number of items. We have made specific findings in respect to each item which has not been stipulated. To such extent our findings are dispositive of the issues. It would not serve any useful purpose to analyze and discuss in detail the substantial amount of evidence submitted in these proceedings upon which our findings are based. We will, therefore, take up only briefly each of the disputed items and indicate broadly the reasons for our determinations. 1. The main item in dispute between the parties is the amount of alleged cash on hand, other than moneys on deposit in banks, which Axler urges he owned at the beginning of the net worth period. Respondent has not credited Axler with any such cash on hand either at the beginning of the net worth period or the end of any of the taxable years 1943-1950. Petitioners assert that Axler had over $90,000 in cash at the opening of the net worth period. We will not repeat our extensive Findings of Fact relating to cash on hand for the taxable years here involved, but merely take up the question of cash *296 on hand as it affects the years 1947-1950, which years are not barred by limitations. In respect to such years the respondent's determination is prima facie correct and the burden is upon the petitioner to show the contrary. As we indicated in the Findings of Fact relating to the determination of deficiencies, the record here shows that petitioner had cash on hand as of January 1, 1947, in the amount of $29,270. The problem then remaining in respect to the deficiencies is the manner in which such cash should be distributed over the several years 1947-1950, if it was not likewise on hand at the end of 1950. Respondent in his determination has not credited petitioner with cash at any time. On brief, however, he argues that if we should find that there was cash on hand at the beginning of 1947 in an amount of about $30,000, we should also find that petitioner had a substantial amount of cash on hand at the end of 1950, thereby leaving largely intact the deficiencies as determined for the years 1947-1950. This alternative argument, however, does not carry with it the presumption of correctness which attends his determination in his statutory notice, and we think it is clear upon the record *297 as a whole as was indicated supra in our discussion of fraud that the accumulated cash was expended by petitioner by the end of 1947. We sustain respondent's determination that Axler had no cash on hand at the end of 1947, partly on the basis of the foregoing discussion and partly because petitioner has failed to sustain his burden of proof to the contrary. We likewise sustain the respondent's determination that Axler had no cash on hand at the end of 1948, because of petitioner's failure to meet the burden of proving the contrary. We find that Axler, at the end of the years 1949 and 1950, had cash on hand in the respective amounts of $5,500 and $447.59, as reflected on his books. These items are again referred to in the following paragraph 2. 2. The net worth schedule includes cash on deposit in Axler's business account at the Security National Bank, representing bank balances as reflected in the bank's ledger accounts at the end of each year of the period. Petitioners do not challenge these figures as such but contend that other figures (reconciled) which would give effect to checks outstanding on such dates would more properly reflect the real asset position of petitioners at *298 such times. We agree. Petitioners introduced into evidence such reconciled figures by the testimony of Bekaert based on the audit he undertook at petitioners' counsel's request in 1950, at which time he examined fully Axler's checks and other available records. We think that despite a tendency for the unreconciled amounts to "iron out" over a period of years, particularly if at the end of the period the account has been closed and the balance is zero, in terms of the real net asset position of the petitioners, reconciled figures present the truer picture and should be utilized when so proved by petitioners as here. Respondent argues that if we hold that the reconciled bank account figures are to be used in the computation of petitioners' net worth, the difference between the balance per bank statement and the balance per reconciliation should be considered as additional assets or more nondeductible expenses of petitioners in computing their net worth thereby, in effect, offsetting the adjustments made by reconciling the bank figures. We do not agree with this conditional viewpoint, since there has been no showing that the checks outstanding (upon which reconciliation of the bank *299 balance is based) have not already been accounted for in the stipulated items of assets and nondeductible expenditures. Respondent further argues on brief as follows balances, then the respondent argues that the cash on hand shown by the books at December 31, 1949, $5,500.00 * * * should be inserted in the net worth computation. Upon this premise then, the Court should insert the cash on hand figure as shown by the books at December 31, 1950, $447.59." We agree with this viewpoint, as indicated in the preceding paragraph 1, and have reflected the changes in Schedule B of our Findings. We add that petitioners' reply brief does not take issue with respondent as to the above adjustments. 3. The net worth figures for prepaid expenses were taken from Axler's books and records. No evidence having been introduced which would reflect on the accuracy of such figures, we adopt them as included in the net worth computation. Cf. H. A. Hurley, supra. 4. The amount of $90,897.04 recorded in the net worth computation for petitioners' real property and improvements assets exceeds the amount of such property listed on the 1950 tax return ($89,171.66) by $1,815.38. This difference is largely *300 accounted for by the fact that petitioner, in his 1949 and 1950 returns failed to list an item of $1,769.81 for real property improvements, previously listed in his 1947 and 1948 returns, and still owned by him at the end of 1950. The remaining difference of $45.57, while impossible to pinpoint as to source upon the present state of the record, is evidently attributable to some minor difference in the costs of the various properties as determined by respondent. Such costs were determined after a careful search of property records and deeds and after personal investigation and inquiry of the sellers as to price. In the light of the care with which respondent has prepared this portion of his net worth computation, and in the absence of a showing by petitioners of any specific discrepancy, we would not be justified in upsetting respondent's determination, which closely agrees with the over-all cost of petitioner's property holdings as reported on his 1950 return, which is by far the most complete and accurate return filed by him in these respects. Cf. Estate of J. A. Kreis (C.A. 6, 1955) 227 Fed. (2d) 753, affirming a Memorandum Opinion of this Court. 5. The fifth item *301 in dispute is based largely upon the figures employed by respondent in item number 4 above and involves the amounts computed by respondent as a reserve for depreciation in respect to Axler's depreciable real property and improvements, store equipment and fixtures. At the time of hearing, petitioners appeared to have seriously challenged these figures, not so much with respect to the cost basis of the properties for depreciation, but with respect to the rate employed by respondent for computing depreciation on each of the properties. Our Findings of Fact make an extensive comparison of the amounts claimed by Axler for depreciation in each of the years 1943-1950, respondent's effective allowance for depreciation in each of these years, the difference between the two, the reserve for depreciation shown by Axler on his various tax returns and the reserve for depreciation in respect to each of the years as computed by respondent in his net worth statement. The evidence shows that respondent, in the main, utilized the rates for depreciation previously employed by Axler himself in computing the allowance for depreciation on his 1949 and 1950 returns. To this extent we do not think that petitioners *302 here can be seriously considered as quarreling therewith. More important, however, respondent's total allowance as a reserve for depreciation over the net worth period is only $1,346.06 less than the total reserve therefor as computed by petitioners on their 1950 return, which we have already indicated is in these respects the most acceptable and reliable of petitioners' returns. Respondent has explained the difference as largely attributable to some $1,700, a cumulative figure, disallowed by him in computation of net worth for depreciation claimed by petitioners on their personal residence. We think there can be no question as to the validity of such disallowance. Thus it would appear that respecting the total of the reserve for depreciation over the full period of years 1943-1950, respondent, in effect, has allowed a somewhat greater amount than that previously claimed therefor by petitioners except for the disallowance of the item relating to their personal residence. If petitioners' real point is that respondent's effective allowance for depreciation in the years 1944 and 1945, not here involved, is too large and that the amounts allowed in each of the years here involved is *303 relatively too small, having the over-all effect of understating the corrected net income for the years not involved and overstating the corrected net income for the years here involved, we point out that our Findings of Fact show that the differences in such amounts for the years 1944 and 1945 are insignificant, being, respectively, $12.03 and $120.23. We hold with the respondent on this item. 6. The last net worth item in dispute relates to the accounts payable accrued in the years 1948 and 1950, in the amounts of $7,507.53 and $4,634.50, respectively. We have found the amounts utilized by respondent in his net worth computation and drawn by the special agent from Axler's own books and records to be correct and here so hold. Petitioners do not contend that such amounts were not correctly shown on Axler's books. No further adjustments in respect to any of the other years need be made for this type of account, since the testimony before us fails to indicate the amount of any year-end accounts payable for any such years. Respondent's determination of deficiencies for the years 1947-1950, inclusive, is sustained, subject to the adjustments indicated. Our ultimate net worth determination *304 shows an increase in deficiency (and consequently of penalties) for the taxable year 1949. Claim therefor having been made by respondent in his amended answer under the provisions of section 272(e), we hold petitioner liable for such additional amount. See W. H. Weaver, 25 T.C. - (filed February 21, 1956). Respondent has determined penalties under section 294(d)(2) in respect to each of the years here involved except 1948. Petitioners have introduced no evidence and have made no argument in respect to the applicability of such penalties. We must, therefore, sustain respondent's determination to the extent, if any, in each year, justified by the calculations in the determination under Rule 50, in respect to the years 1947, 1949 and 1950, for which years we have found deficiencies in income taxes. H. R. Smith, 20 T.C. 663 (1953) and G. E. Fuller, 20 T.C. 308 (1953). Decisions will be entered under Rule 50. Footnotes
1. The cash overdraft figures for individual years are complete for each individual year rather than cumulative and do not reflect the ein overdrafts in previous years.↩
*. This figure reflects petitioner's corrected net income plus $2,373.58 reported by petitioner as a loss on his 1947 return.↩